|  |  |
|---|---|
| UNITED STATES BANKRUPTCY COURT<br>SOUTHERN DISTRICT OF NEW YORK | **FOR PUBLICATION** |
| ----------------------------------------------------------------X | |
| In re:                                 : | |
|                                      : | Chapter 11 (Confirmed) |
| MARK IV INDUSTRIES, INC.,           : | Case No. 09-12795 (SMB) |
|                                      : | Jointly Administered |
|                Debtor.                : | |
| ----------------------------------------------------------------X | |
| MARK IV INDUSTRIES, INC.            : | |
|                Plaintiff,            : | |
|           -- against --            : | Adv. Proc. No. 09-1507 (SMB) |
| THE NEW MEXICO ENVIRONMENT    : | |
| DEPARTMENT, and CHANT FAMILY II  : | |
| LIMITED PARTNERSHIP,             : | |
|              Defendants /        : | |
|              Counterplaintiffs,     : | |
|          -- against --             : | |
| MARK IV INDUSTRIES, INC.            : | |
|              Counterdefendant     : | |
| ----------------------------------------------------------------X | |

## MEMORANDUM DECISION REGARDING
## CROSS MOTIONS FOR SUMMARY JUDGMENT

**A P P E A R A N C E S:**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM
Attorney for Mark IV Industries, Inc.
Four Times Square
New York, NY 10036-6522

     Jay M. Goffman, Esq.
        Of Counsel

    -- and --

155 N. Wacker Drive, Suite 2700
Chicago, Illinois 60606-1720

    J. Eric Ivester, Esq.
    Matthew M. Murphy, Esq.
        Of Counsel

1440 New York Avenue, N.W.
Washington, D.C. 20005-2111

    Kenneth Berlin, Esq.
    Elizabeth Malone, Esq.
        Of Counsel

NEW MEXICO ENVIRONMENT DEPARTMENT
Post Office Box 5469
Santa Fe, New Mexico 87502

    Charles de Saillan, Esq.
        Of Counsel

David T. Thuma, Esq.
Attorney for Chant II Limited Partnership
500 Marquette N.W., Suite 650
Albuquerque, New Mexico 87102

UNITED STATES ATTORNEY
FOR THE SOUTHERN DISTRICT OF NEW YORK
Attorney for the United States Environmental Protection Agency
86 Chambers Street – Third Floor
New York, New York 10007

    Daniel P. Filor, Esq.
    Alicia M. Simmons, Esq.
        Assistant United States Attorneys

**STUART M. BERNSTEIN**
**United States Bankruptcy Judge:**

      Mark IV Industries Inc. ("Mark IV") commenced this adversary proceeding, <u>inter alia</u>, to obtain a declaratory judgment that certain environmental cleanup and remediation obligations[1] were discharged under 11 U.S.C. § 1141(d)(3).  (<u>See</u> <u>Complaint</u>, dated Oct. 5, 2009 (ECF Doc. #

---

[1]     The terms "cleanup" and "remediation" are used interchangeably in this opinion, and include the investigation, monitoring, sampling, containment and removal of contaminated groundwater or soil.

2

1).)[2]  The New Mexico Environment Department ("NMED") contests the discharge.  Chant Family II Limited Partnership ("Chant")[3] and the United States Environmental Protection Agency ("EPA") intervened, and support NMED's position.

Mark IV and NMED each moved for summary judgment.  For the reasons that follow, NMED's motion is granted and Mark IV's motion is denied.

### BACKGROUND

**A.    The Site**

In 1956, Gulton Industries, Inc. ("Gulton") acquired property located at 14800 Central Avenue, SE in Albuquerque, New Mexico (the "Site").  (Stipulation of Facts, dated Feb. 5, 2010 ("Stipulation of Facts"), at ¶ 1 (ECF Doc. # 25).)  Gulton fabricated electronic circuit boards at the Site.  (Id. at ¶ 2.)  The operations entailed etching metal wafer boards using caustic chemicals, rinsing the wafer boards with a mixture of chlorinated solvents and water and discharging the rinse water to a septic tank and leach field and unlined evaporation lagoons.  (Id. at ¶¶ 3–5.)  Gulton sold the Site to Chant on August 11, 1978, but continued operations at the Site through at least 1979 pursuant to an agreement with Chant.  (Id. at ¶¶ 6, 8.)  Gulton ceased operating at the Site by late 1979, and approximately eight years later, in 1987, Mark IV acquired Gulton.  (Id. at ¶¶ 9–10.)

**B.    Investigation and Remediation Activity**

New Mexico Code §§ 74-6-1, et seq. (the "Water Quality Act") authorizes the New Mexico Water Quality Control Commission (the "Commission") to "adopt water quality

---

[2]    Unless otherwise noted, the ECF Doc. #s refer to Adv. Pro. No. 09–1507.

[3]    References to "Chant" include the predecessors to Chant Family II Limited Partnership.

3

standards for surface and ground waters of the state," N.M. STAT. ANN. § 74-6-4(D) (2010), and adopt regulations "to prevent or abate water pollution in the state." Id. at § 74-6-4(E). Pursuant to this authority, the Commission adopted regulations for the abatement of groundwater pollution in accordance with a two-stage abatement plan, which must be approved by NMED. N.M. ADMIN. CODE §§ 20.6.2.4101–4115 (2010). The Water Quality Act also grants NMED specified enforcement powers that include issuing a compliance order, assessing a civil penalty or commencing a civil action for appropriate relief, including injunctive relief.[4]

In 1990, NMED conducted a Preliminary Assessment of the Site, and in 1992, a Screening Site Investigation of the Site. (Stipulation of Facts at ¶ 11.) The latter found metals (cadmium, chromium, copper, and lead) above background levels in the vicinity of the settling ponds and septic tank, and in areas in the arroyos. (Id.) It also detected volatile organic compounds ("VOCs")—specifically trichloroethylene ("TCE"), dichloroethylene ("DCE"), and vinyl chloride—in groundwater samples from temporary piezometers near the Site. (Id.) The levels of these compounds exceeded state groundwater quality standards and federal and state drinking water standards. (Id.)

From 1994 to 1995, Mark IV prepared and implemented a Site Assessment and Preliminary Closure Workplan that identified and addressed four areas of concern at the site: a concrete pad located at the rear of the printed circuit shop; the settling ponds; the septic tank and

---

[4] N.M. STAT. ANN. § 74-6-10(A) states:

Whenever, on the basis of any information, [NMED] determines that a person violated or is violating a requirement, regulation or water quality standard adopted pursuant to the Water Quality Act . . . [NMED] may:

(1) issue a compliance order requiring compliance immediately or within a specified time period or issue a compliance order assessing a civil penalty, or both; or

(2) commence a civil action in district court for appropriate relief, including injunctive relief.

4

leach field; and groundwater. (Id. at ¶ 12.) As part of its work plan, Mark IV installed and sampled seventy-three soil vapor survey points. (Id. at ¶ 14.) The samples disclosed three VOCs (TCE, trichloroethane, and tetrachloroethylene) in soil vapor along contiguous drainage patterns south of the septic tank and evaporation lagoons. (Id.) None of the soil and sediment matrix samples contained detectable VOCs, but some had metal concentrations above background level. (Id.) The samples also revealed TCE in the groundwater above state groundwater quality standards and federal and state drinking water standards. (Id.) Mark IV implemented a soil remediation project that removed the septic tank and leach field and the evaporation lagoons, along with 1,600 cubic yards of soil. (Id. at ¶ 15.)

These steps did not resolve the groundwater contamination. Consequently, in November 1996, Mark IV voluntarily submitted a Stage 1 Abatement Plan for the Site to NMED under the Water Quality Act. (Id. at ¶ 16.) The Stage 1 Abatement Plan called for Mark IV to investigate and delineate groundwater contamination at the Site. (Id.) In March 1997, NMED approved the Stage 1 Abatement Plan, and from 1997 to 2007, Mark IV conducted the required investigations. (Id. at ¶ 17.) In February 2007, Mark IV submitted a Stage 1 Completion Report for the Stage 1 Abatement Plan, (id. at ¶ 19), and in July 2007, NMED approved the completion report and required a Stage 2 Abatement Plan. (Id. at ¶ 20.)

In September 2007, Mark IV submitted a Stage 2 Abatement Plan to NMED. (Id. at ¶ 21.) The latter outlined the cleanup plan for groundwater at the Site using a hydrogen releasing compound injection process that Mark IV had previously studied. (Id. at ¶ 21; see ¶ 18.) The process facilitates the microbial degradation of chlorinated hydrocarbons such as TCE, DCE and vinyl chloride. (Affidavit of William Olson, dated February 5, 2010 ("Olson Affidavit"), at ¶ 23 (ECF Doc. # 21).) NMED approved the Stage 2 Abatement Plan in March 2008. (Stipulation of

5

Facts at ¶ 22.) Following approval, Mark IV injected the hydrogen releasing compound into the groundwater in March, June, September and December 2008, (id. at ¶ 23), but stopped the injections and the scheduled groundwater monitoring after December 2008. (Id. at ¶ 24.)

The parties agree that VOCs currently remain in the groundwater beneath the Site at levels exceeding applicable New Mexico groundwater quality standards and state and federal drinking water standards. (Id. at ¶ 25.) They disagree, however, as to whether the contaminants are migrating. William Olson, NMED's Bureau Chief of the Ground Water Quality Bureau, has stated that without the injections, the enhanced biological degradation will stop, and the TCE and DCE will not degrade, or will degrade only very slowly. As the groundwater continues to move, it will transport these contaminants and become a source of ongoing pollution. (Olson Affidavit at ¶¶ 26–28.) The sampling evidence, in this regard, shows that the levels of TCE have increased fairly steadily at a hydrologically downgradient monitoring well, MW-18. (Id. at ¶ 36.) Thomas H. Forbes, Mark IV's expert, has asserted that the Site no longer contains current sources of contamination; the only residual contamination at the Site was caused by historical operation and "there is no significant threat of the residual contamination migrating to endanger downgradient water supply wells." (See Declaration of Thomas H. Forbes in Support of Mark IV's Motion for Summary Judgment, dated Feb. 4, 2010 ("Forbes Declaration"), at ¶ 7; accord ¶¶ 36–38, 41, 46.)[5]

C.    **Mark IV Bankruptcy Proceedings**

Mark IV filed its chapter 11 petition in this Court on April 30, 2009. (See Stipulation of Facts at ¶ 26.) On May 26 and 27, 2009, it notified NMED and Chant of its intention to

---

[5]    A copy of the Forbes Declaration is attached as Exhibit 2 to Mark IV Industries, Inc.'s Memorandum of Law in Support of Its Motion for Summary Judgment, dated Feb 5, 2010 ("Mark IV Summary Judgment Memo") (ECF Doc. # 24).

6

discontinue all cleanup and remediation efforts, and on June 16, 2009, Mark IV filed schedules identifying NMED and Chant as holders of unsecured, non-priority claims. (Id. at ¶¶ 27–28.) Chant filed a proof of claim in the sum of $900,000.00 seeking recovery of the costs to cleanup contamination at the Site. (Mark IV Summary Judgment Memo, Ex. 3.) NMED filed a contingent proof of claim in the sum of $1,297,342 relating to the contamination at the Site. (Id., Ex. 5.) An attachment to NMED's claim stated that the claim was "not intended to waive or to limit in any way the right of [NMED] to argue that the claims it has against Mark IV for cleanup of the Site is not dischargeable under the Confirmation Order or the Bankruptcy Code, and the [NMED] expressly reserves that right." (Id. at 1.) The Court confirmed Mark IV's chapter 11 plan on September 23, 2009, but the confirmation order expressly preserved NMED's right to challenge the dischargeability of the environmental obligations. (Findings of Fact, Conclusions of Law and Order Confirming First Amended Joint Plan of Reorganization of Mark IV Industries, Inc. and its Affiliated Debtors and Debtors-in-Possession, dated Sept. 23, 2009, at ¶ 21) (ECF Doc. # 528, filed in Case No. 09-12795).)

### D. This Adversary Proceeding

On October 5, 2009, Mark IV filed its complaint seeking a declaration pursuant to 28 U.S.C. § 2201(a) that its environmental obligations to NMED constituted a claim that was discharged pursuant to the confirmation order and 11 U.S.C. § 1141, (Complaint at ¶ 39), and that any attempt by NMED to enforce those environmental obligations would violate 11 U.S.C. § 362(a)(1), (see id. at ¶¶ 43–45), and § 1141. (Id. at ¶ 48.) NMED filed an answer and counterclaim seeking a declaration that its right to injunctive relief under the Water Quality Act was not a dischargeable "claim" or subject to the automatic stay. It also sought an order directing Mark IV to abate the groundwater pollution. (New Mexico Environment Department's

7

Answer to Complaint for Declaratory Judgment and Counterclaim, dated Nov. 12, 2009, at 17–18) (ECF Doc. # 9).)  The Court subsequently permitted Chant and the United States to intervene.  (Stipulation and Proposed Order Permitting the United States and the Chant Family II Partnership to Intervene, dated Dec. 9, 2009, at 4) (ECF Doc. # 16).)

On February 5, 2010, Mark IV and NMED filed cross-motions for summary judgment.  Both the EPA and Chant filed briefs supporting NMED's motion and opposing Mark IV's.  (ECF Doc. #s 36 and 41.)

## DISCUSSION

### A.    Standards Governing Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure, made applicable to this adversary proceeding by Rule 7056 of the Federal Rules of Bankruptcy Procedure, governs summary judgment motions.  A court must grant summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c).  The moving party bears the initial burden of showing that the undisputed facts entitle him to judgment as a matter of law.  Rodriguez v. City of New York, 72 F.3d 1051, 1060–61 (2d Cir. 1995).  The nonmovant must then set forth specific facts that show triable issues, and cannot rely on pleadings containing mere allegations or denials.  FED. R. CIV. P. 56(e); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986); see Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  In deciding whether material factual issues exist, all ambiguities must be resolved and all inferences must be drawn in favor of the nonmoving party.  Matsushita, 475 U.S. at 587.

**B.      The Dischargeability of Mark IV's Environmental Obligations**

The issue common to all of the causes of action is whether Mark IV's equitable duty to remediate the contaminated groundwater constitutes a "claim" within the meaning of the Bankruptcy Code. An order confirming a plan discharges a debtor from any debt arising prior to confirmation. 11 U.S.C. § 1141(d)(1)(A). The resulting discharge "operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor." 11 U.S.C. § 524(a)(2). A debt is a liability on a claim, 11 U.S.C. § 101(12), and as the terms "debt" and "claim" are coextensive, Pennsylvania Dept. of Public Welfare v. Davenport, 495 U.S. 552, 558 (1990), "a discharge under the Code extinguishes the debtor's personal liability on his creditor's claims." Johnson v. Home State Bank, 501 U.S. 78, 84 n.5 (1991).

Code § 101(5)(B) defines "claim" to include a "right to an equitable remedy for breach of performance if such breach gives rise to a right to payment." Where the same breach gives the aggrieved party the alternative of an equitable remedy or money damages, the resulting right is a "claim." In re Ben Franklin Hotel, Assocs., 186 F.3d 301, 305 (3d Cir. 1999) ("[A]n equitable remedy will 'give rise to a right of payment,' and therefore be deemed a 'claim,' when the payment of monetary damages is an alternative to the equitable remedy."); In re Udell, 18 F.3d 403, 408 (7th Cir. 1994) ("[A] right to an equitable remedy for breach of performance is a 'claim' if the same breach also gives rise to a right to a payment 'with respect to' the equitable remedy. If the right to payment is an 'alternative' to the right to an equitable remedy, the necessary relationship clearly exists, for the two remedies would be substitutes for one another.") (footnote omitted); United States v. LTV Corp. (In re Chateaugay Corp.), 944 F.2d 997, 1008 (2d Cir. 1991) ("An injunction that does no more than impose an obligation entirely as an

9

alternative to a payment right is dischargeable."); 2 ALAN N. RESNICK & HENRY J. SOMMER, COLLIER ON BANKRUPTCY ¶ 101.05[5], at 101–47 (16th ed. 2010) ("COLLIER") (If a judgment for specific performance can be satisfied by an alternative right to payment in the event performance is refused, the creditor entitled to specific performance has a "claim" under the Bankruptcy Code.); see United States v. Apex Oil Co., 579 F.3d 734, 736 (7th Cir. 2009) ("The natural reading of [11 U.S.C. § 101(5)(B)] is that if the holder of an equitable claim can, in the event that the equitable remedy turns out to be unobtainable, obtain a money judgment instead, the claim is dischargeable."), cert. denied, No. 09-1023, 2010 WL 752322 (Sup. Ct. Oct. 4, 2010). Conversely, where a creditor does not have the option to accept money in lieu of the equitable remedy, the equitable obligation is not a "claim" and is not dischargeable in bankruptcy. 2 COLLIER ¶ 101.05[5], at 101-47 to 101-48 ("[R]ights to an equitable remedy for breach of performance with respect to which such breach does not give rise to a right to payment are not 'claims' within the Code's contemplation, and would not therefore be dischargeable in bankruptcy, unless such obligations could be translated into a claim for damages if breached."); see Apex Oil, 579 F.3d at 737 ("[T]he government's equitable claim . . . entitles the government only to require the defendant to clean up the contaminated site at the defendant's expense. . . . The plaintiff in our case (the government) is not seeking a payment of money and the injunction that it has obtained does not entitle it to payment.").

These distinctions have proved difficult to apply in the area of environmental cleanup obligations. In Ohio v. Kovacs, 469 U.S. 274 (1985), the State of Ohio obtained an injunction requiring the defendants to remove certain waste products from a site. Id. at 276. After the defendants failed to comply with the injunction, Ohio obtained the appointment of a state court receiver who took possession of the site and the defendants' assets in order to implement the site

10

cleanup. Id. Before the receiver could complete his task, Kovacs, one of the defendants, filed a bankruptcy petition. Id. Ohio filed a motion in state court to discover Kovacs' current income and assets,[6] and commenced an adversary proceeding in the bankruptcy court to determine the dischargeability of Kovacs' obligation to cleanup the site. Id. at 276–77. Ohio argued, inter alia, that Kovacs' breach of his obligation under the injunction did not give rise to a "right to payment" within the meaning of 11 U.S.C. § 101(4)(B), now renumbered as § 101(5)(B). Id. at 279.

The Supreme Court affirmed the lower courts' determinations that the cleanup obligation was a dischargeable "claim." When Kovacs breached the injunction, Ohio chose not to prosecute him under the environmental laws or bring civil or criminal contempt proceedings. Instead, it secured the appointment of a receiver to take possession of Kovacs' non-exempt assets (as well as the other defendants' assets) and perform the cleanup himself. Ohio's actions dispossessed Kovacs, removed him from control over the site, and divested him of the assets he might have used to cleanup the site. When Kovacs' trustee sought to recover Kovacs' assets from the receiver, the receiver sought an injunction. Dispossessed, disabled and divested, Kovacs was unable to perform the duties imposed under the injunction, and all that the receiver and Ohio wanted at that point from Kovacs to satisfy his obligation was the payment of money. Id. at 282–83.

The Supreme Court ended its opinion with a cautionary note regarding what it was not deciding:

> [W]e do not hold that the injunction against bringing further toxic wastes on the premises or against any conduct that will contribute to the pollution of the site or the State's waters is dischargeable in bankruptcy . . . . Finally, we do not question

---

[6] The bankruptcy court stayed the state court proceedings. Kovacs, 469 U.S. at 276.

11

> that anyone in possession of the site-whether it is Kovacs or another . . . must comply with the environmental laws of the State of Ohio. Plainly, that person or firm may not maintain a nuisance, pollute the waters of the State, or refuse to remove the source of such conditions. As the case comes to us, however, Kovacs has been dispossessed and the State seeks to enforce his cleanup obligation by a money judgment.

Id. at 284–85.

The Second Circuit considered the dischargeability of environmental obligations under Kovacs in Chateaugay. There, the debtor, LTV Steel Corporation ("LTV"), generated hazardous wastes at its various sites. See Chateaugay, 944 F.2d at 999. Prior to the chapter 11 case, the EPA spent approximately $32 million in response costs incurred at fourteen sites where LTV had been identified as a potentially responsible party ("PRP") under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601 et seq.[7] Id. The EPA filed a proof of claim for the approximate $32 million, but alleged that it anticipated additional response costs at thirteen of the sites, and possibly at other sites, and the claim might ultimately be much greater. Id.

The Government eventually brought an adversary proceeding for a declaratory judgment that response costs incurred post-confirmation were not dischargeable because they did not arise from prepetition claims, and that certain environmental injunctive obligations were not dischargeable regardless of when they arose. See United States v. Chateaugay Corp. (In re Chateaugay Corp.), 112 B.R. 513, 517 (S.D.N.Y. 1990), aff'd, 944 F.2d 997 (2d Cir. 1991). Focusing on the injunctive obligations, and as discussed earlier, the Court explained that the breach of an equitable obligation gives rise to a dischargeable claim when the aggrieved party

---

[7] Under CERCLA, the EPA may select among alternative remedies when faced with a release or threatened release of a hazardous substance that is sufficiently severe to include the site on the National Priority List. It can order the PRP to take the remedial action, or take the remedial action itself using Superfund money, and seek reimbursement after the costs have been incurred. Chateaugay, 944 F.2d at 999–1000.

12

has the right to receive damages as an alternative to an equitable remedy. Distinguishing between orders to cleanup accumulated waste and orders to stop or ameliorate ongoing pollution, the Court stated:

> [A] cleanup order that accomplishes the dual objectives of removing accumulated wastes and stopping or ameliorating ongoing pollution emanating from such wastes is not a dischargeable claim. It is true that, if in lieu of such an order, EPA had undertaken the removal itself and sued for the response costs, its action would have both removed the accumulated waste and prevented continued pollution. But it is only the first attribute of the order that can be said to remedy a breach that gives rise to a right to payment. Since there is no option to accept payment in lieu of continued pollution, any order that to any extent ends or ameliorates continued pollution is not an order for breach of an obligation that gives rise to a right of payment and is for that reason not a "claim." But an order to clean up a site, to the extent that it imposes obligations distinct from any obligation to stop or ameliorate ongoing pollution, is a "claim" if the creditor obtaining the order had the option, which CERCLA confers, to do the cleanup work itself and sue for response costs, thereby converting the injunction into a monetary obligation.

Chateaugay, 944 F.2d at 1008.

Kovacs and Chateaugay require the Court to weigh three factors in determining whether a cleanup obligation is dischargeable. First, is the debtor capable of executing the equitable decree, or can he only comply by paying someone else to do it? In Kovacs, the Supreme Court emphasized that Ohio's and the receiver's action had dispossessed Kovacs and made it impossible for Kovacs to comply, but cautioned that the result might be different if Kovacs had remained in possession and control of the site. Accord Chateaugay, 944 F.2d at 1008 ("What seems to have been decisive was the fact that Ohio obtained the appointment of a receiver, precluded Kovacs from taking any steps to comply with the injunction, and was seeking from Kovacs only the payment of money."); Durham Inland Wetlands & Watercourses Agency v. Jimmo (In re Jimmo), 204 B.R. 655, 660 (Bankr. D. Conn. 1997) (remediation order that directed debtor to reimburse plaintiff for remediation work, and neither ordered nor permitted the debtor to do the work himself, was a dischargeable claim); cf. Torwico Elecs., Inc. v. New Jersey (In re

13

Torwico Elecs., Inc.), 8 F.3d 146, 151 (3d Cir. 1993) ("The single fact which Torwico relies on most heavily is that it is no longer in possession of the site, and has not been in possession for several years. . . . We do not find Torwico's suggested distinction persuasive.  Unlike the debtor in Kovacs, Torwico can (and in the state's view, must) conduct the cleanup: it has access to the site and the state has not, apparently, performed any cleanup on its own."), cert. denied, 511 U.S. 1046 (1994).  However, the mere fact that the debtor must expend money to comply does not convert an equitable obligation into a dischargeable claim.  Apex Oil, 579 F.3d at 738 ("[The] discharge must indeed be limited to cases in which the claim gives rise to a right to payment because the equitable decree cannot be executed, rather than merely imposing a cost on the defendant, as virtually all equitable decrees do."); Torwico, 8 F.3d at 150 n.4 ("Were we to adopt the bankruptcy court's position that any order requiring the debtor to expend money creates a dischargeable claim, it is unlikely that the state could effectively enforce its laws: virtually all enforcement actions impose some costs on the violator.").

Second, is the pollution "ongoing"?  Cf. In re CMC Heartland Partners, 966 F.2d 1143, 1147 (7th Cir. 1992) ("To avoid the conclusion that it is repackaging a forfeited claim for damages, the EPA must establish that harmful releases are threatened or ongoing-in the language of [CERCLA] § 106(a), that the Pit poses 'an imminent and substantial endangerment to the public health or welfare or the environment because of an actual or threatened release of a hazardous substance.'  Otherwise there is no nuisance to clean up.").  Where pollution is ongoing, the debtor must stop or ameliorate the nuisance; it does not have the option to pay money and continue to pollute.  Torwico, 8 F.3d at 151 n.6 ("Here, Torwico's obligation was an obligation to ameliorate ongoing pollution; it had no option to pay for the right to allow its wastes to continue to seep into the environment."); CMC Heartland Partners v. Gen. Motors

14

Corp., No. 92 C 4449, 1994 WL 498357, at *7 (N.D. Ill. Aug. 30, 1994) (Report and Recommendation of Magistrate Judge Lefkow) (noting "the distinction between a claim for damages from past releases of hazardous substances and a claim for remediation of a present threat," and concluding that "[t]he first is dischargeable; the second, though undeniably 'arising out of past conduct,' is not").

Third, if the pollution is not ongoing, or if the order imposes discrete obligations to cleanup accumulated waste, does the environmental agency have the "option" under the statute giving rise to the equitable obligation to remove the waste and seek reimbursement from the debtor? Chateaugay, 944 F.2d at 1008 ("[A]n order to clean up a site, to the extent that it imposes obligations distinct from any obligation to stop or ameliorate ongoing pollution, is a 'claim' if the creditor obtaining the order had the option, which CERCLA confers, to do the cleanup work itself and sue for response costs, thereby converting the injunction into a monetary obligation."); see Apex Oil, 579 F.3d at 736 ("[T]he Resource Conservation and Recovery Act, which is the basis of the government's equitable claim, does not entitle a plaintiff to demand, in lieu of action by the defendant that may include the hiring of another firm to perform a clean up ordered by the court, payment of clean-up costs. It does not authorize any form of monetary relief.") (emphasis in original).

Applying these factors leads to the conclusion that Mark IV's environmental obligations are not dischargeable. Although Mark IV is no longer in possession of the Site, it has access to it for the purpose of complying with its obligations to NMED. It conducted its monitoring, sampling and cleanup activities long after Chant assumed possession. Furthermore, given Chant's position, it is plainly prepared to invite Mark IV back to the Site to complete the remediation rather than do it itself. That Mark IV must spend money to comply does not

15

transform the equitable cleanup remedy into a "claim." Apex Oil, 579 F.3d at 738 ("The root arbitrariness of Apex's position is that whether a polluter can clean up his pollution himself or has to hire someone to do it has no relevance to the policy of either the Bankruptcy Code or the Resource Conservation and Recovery Act.").

Whether the pollution is ongoing presents a more difficult question because Chateaugay did not amplify the term. See ADAM P. STROCHAK ET AL., ENVIRONMENTAL ISSUES IN BANKRUPTCY CASES § 6[1][b], at 43–44 (Collier Monograph 2009) ("Unfortunately, the [Chateaugay] court provided no guidance as to what constitutes 'current pollution,' except to say that most injunctions will fall under the non-claim side of the line."). Mark IV has not conducted operations at the Site for over twenty years, and previously removed or remediated the settling ponds, septic tank and the leach field. Contaminants nevertheless remain in the groundwater at levels that exceed acceptable federal and state water quality standards. NMED's expert has opined that the contaminants are migrating downgradient, suggesting that the pollution is ongoing. Conversely, Mark IV's expert has concluded that the residual contamination at the Site does not pose a significant threat of migrating or endangering the downgradient water supply, suggesting that there is no ongoing pollution or threat.

The Court cannot resolve this factual dispute in the context of the current cross-motions, but it is unnecessary to do so. NMED obtained and seeks to enforce the cleanup order under the New Mexico Water Quality Act. It contends and Mark IV does not appear to dispute that the Water Quality Act does not allow NMED the alternative to perform the cleanup itself and recover the costs from Mark IV.[8] In other words, NMED does not have an alternative monetary

---

[8] The Water Quality Act authorizes NMED to seek penalties. Mark IV has not argued that this remedy renders the cleanup obligation a "claim."

remedy for breach of the cleanup order.

Mark IV nevertheless argues that NMED can remediate the Site under other provisions of state and federal law.  For example, New Mexico's Hazardous Waste Act empowers NMED to "take any action necessary or appropriate to [protect people or mitigate harm] which might arise from hazardous substance incidents,[9] including . . . providing for cleanup."  N.M. STAT. ANN. § 74-4-7(A) (2010).  In addition, under CERCLA, covered persons are liable for "all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe."  42 U.S.C. § 9607(a)(4)(A).  Indeed, NMED's Contingent Proof of Claim invoked the Hazardous Waste Act, (Mark IV Summary Judgment Memo, Ex. 5, at 4-5), and CERCLA, (id. at 6-7), to support its claim.

Assuming without deciding that NMED could have proceeded under either statute instead of the Water Quality Act, the focus is the statute under which it elected to proceed.  If that statute does not provide NMED with the option to cleanup the contamination and recover the costs, Mark IV's equitable obligation to cleanup the contamination is not a "claim" that was discharged by the confirmation order.  Torwico, 8 F.3d at 151 n.6 ("[I]t is undisputed that the order was issued under statutory sections which do not allow the state to perform the cleanup and then sue for reimbursement of its costs.  That authority may exist under other potentially relevant statutes for the state to perform the cleanup and seek reimbursement for its costs is irrelevant."); cf. Sheerin v. Davis (In re Davis), 3 F.3d 113, 116 (5th Cir. 1993) ("While section 101(5)(B) encourages creditors to select money damages from among alternative remedies, it does not

---

[9]    The Hazardous Waste Act defines a "hazardous substance incident" as "any emergency incident involving a chemical or chemicals, including but not limited to transportation wrecks, accidental spills or leaks, fires or explosions, which incident creates the reasonable probability of injury to human health or property."  N.M. STAT. ANN. § 74-4-3 (2010).

require creditors entitled to an equitable remedy to select a suboptimal remedy of money damages.").

In re Carolina Tobacco Co., No. 05-34156, 2006 U.S. Dist. LEXIS 6577 (Bankr. D. Or. 2006), amended by, 2006 Bankr. LEXIS 335 (Bankr. D. Or. Feb. 1, 2006), aff'd, 360 B.R. 702 (D. Or. 2007), which Mark IV discusses and attaches to its memorandum opposing NMED's motion, does not support a different conclusion. There, various states and the District of Columbia (the "States") entered into a settlement with several tobacco companies to settle claims brought by the States. As part of the settlement, the States enacted legislation that required non-settling tobacco companies to make payments into escrow accounts based on sales to secure the non-settling companies' future liability in the event of a later judgment or settlement. A non-settling company that failed to make the escrow payments to a State was barred from selling tobacco products in that State. Id. at *3–4.

The debtor, a non-settling tobacco company, failed to make the escrow payments required for its 2004 sales. In its subsequent bankruptcy, it sought a determination that the obligation to pay the 2004 escrow deposits was a "claim." The bankruptcy court concluded that the obligation was a "claim" under 11 U.S.C. § 101(5)(A) because it reflected an obligation to make a payment that the State could enforce. Id. at *9. Viewing the settlement scheme as a whole, the bankruptcy court also rejected the States' argument that the duty to make the escrow payments was not a "claim" under § 101(5)(A) because the States had placed that duty in one statute and their right to recover the escrow payments in another. Id. at *11–12.

Mark IV cites this portion of the opinion in support of its contention that the Court is not limited to examining the statutory remedies available to NMED under the Water Quality Act,

18

and instead, should consider the monetary remedies available under the Hazardous Waste Act and CERCLA.  (See <u>Mark IV Industries, Inc.'s Memorandum of Law in Opposition to the New Mexico Environment Department's Motion for Summary Judgment</u>, dated Mar. 5, 2010, at 6–7 (ECF Doc. # 32) ("NMED cannot split its claim against Mark IV into two pieces —one seeking injunctive relief, which it is asserting in these adversary proceedings, and one for monetary payment, which it has asserted by filing its proofs of claim— to avoid having the injunction be deemed a dischargeable claim.").)  However, the discussion in <u>Carolina Tobacco</u> cited by Mark IV dealt with whether the unpaid prepetition escrow deposits were "claims" under § 101(5)(A).  The bankruptcy court was not addressing whether they were "claims" under § 101(5)(B) because an alternative right to payment existed under another statute.  In fact, the bankruptcy court rejected the debtor's argument that the obligation to make the deposits was also a "claim" under § 101(5)(B), noting that the breach of that obligation would result in delisting, making it unlawful for the debtor to sell cigarettes in the State.  <u>Id.</u> at *13–15.

Furthermore, Mark IV's argument would result in the discharge of all environmental obligations.  The federal and state governments are the remediators of last resort.  If a private entity ordered to cleanup a polluting site cannot or will not do so, the state or federal government will eventually have to step in and perform the cleanup to protect the public from a health hazard.  At that point, the most that the governmental entity could do is seek reimbursement.  Under Mark IV's theory, a government's ability to cleanup the hazard and seek reimbursement, whether under another statute or pursuant to its general police powers, would make the polluter's obligation to stop polluting a dischargeable "claim."

In conclusion, Mark IV's equitable obligation to cleanup the Site is not a "claim."  Hence, it was not discharged, and § 362(a)(1) does not apply.  Accordingly, NMED's motion is

granted and Mark IV's cross-motion is denied. The foregoing disposes of all of the issues raised by the parties in their pleadings. The parties are, therefore, directed to settle an order regarding the disposition of the motions and a separate final judgment.

Dated: New York, New York
       October 21, 2010

/s/ *Stuart M. Bernstein*
STUART M. BERNSTEIN
United States Bankruptcy Court
